THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| ANTHONY JEFFREY CHRISTENSEN,<br>Plaintiff,<br>v.<br>ROBERT BRAITHWAITE et al.,<br>Defendants. | **MEMORANDUM DECISION & ORDER GRANTING SUMMARY-JUDGMENT MOTION**<br>Case No. 2:17-CV-1123-TS<br>District Judge Ted Stewart |

## I. INTRODUCTION

Plaintiff's Fourth Amended Complaint (FAC) remains at issue. (ECF No. 75.) After an order dismissing some defendants and claims, the following defendants endure: Sanpete County (SC) employees Bennett, Bown, Braithwaite, D. Christensen, Gates, Imlay, Neill, Nielson, and G. Nunley. (ECF Nos. 85, at 24; 138.)

Meanwhile, the surviving claims[1] are set forth as follows:

**A.** Invoking his federal constitutional right of freedom of religion, Plaintiff's allegations that, "[a]round April 30, 2017, Defendants Braithwaite, Bown, Christensen, Imlay, Nielsen, and Sgt. Nunley kept Plaintiff from attending church services; for 'safety' and 'security reasons.' (ECF Nos. 75, at 10; 75-34, at 13.)" (Orders, ECF Nos. 85, at 14; 138.)

**B.** Under the Due Process Clause, U.S. Const. amend. XIV, § 1 (providing states shall not "deprive any person of life, liberty, or property, without due process of law"), Plaintiff's

[1]In his documents, Plaintiff sometimes strays to discuss incidents outside the surviving claims. Such incidents are irrelevant to this action, were not considered by the Court, and are not discussed further.

allegations of administrative-segregation-as-punishment, and unconstitutional disciplinary proceedings.

> (a) On April 1, 2017, Plaintiff arrived at SCJ. (ECF No. 75-34, at 13.) Plaintiff "stayed in booking 18 days non housing area, 'receiving area,' shackled for outside rec yard, 'no movement,' . . . ." (*Id.*) Shackling included "hand cuffs, belly chains, and ankle cuffs," ordered by Defendants G. Nunley and carried out by Defendants D. Christensen and Imlay, until May 12, 2017. (ECF No. 75, at 17.) (b) On April 18, 2017, without due process, Defendants Bown, Braithwaite, D. Christensen, Nielson, and G. Nunley initiated proceedings to classify or classified Plaintiff "maximum security" and put him in "administrative segregation." (ECF Nos. 75, at 13; 75-34, at 12.) "Plaintiff placed [by Defendants Imlay and G. Nunley] in "G-unit housing 'lockdown.'" (ECF Nos. 75, at 13; 75-34, at 13.) (c) On May 25, 2017, based on video evidence and without allowing Plaintiff to bring witnesses, Plaintiff found guilty by Defendant Neill of disciplinary charges A02 and B02 and assessed "30 days PI for the A-02 charge and 20 days for the B-02 charge," to "be served concurrently." (ECF Nos. 75, at 14; 75-3, at 3; 75-34, at 13.)

(ECF No. 85, at 21; 138.)

**C.** Invoking his federal constitutional right of freedom of speech, Plaintiff's allegations that "Defendants Nielsen and G. Nunley . . . got him back [for filing grievances] by putting him in a thirty-day lockdown, implicitly chilling his motivation to file more grievances." (ECF Nos. 85, at 23; 138.)

**D.** As to the state-law tort of conversion, Plaintiff's allegations that his "'state tax money'" check was "used without authorization." (ECF Nos. 85, at 23-24 (citation modified); 138.)

Based on their affirmative defense of Plaintiff's failure to exhaust his administrative remedies in SC's grievance process, Defendants now move for summary judgment. (ECF No. 104.) Plaintiff responded through counsel. (ECF No. 153, 153-1 to 153-46.) Defendants replied. (ECF No. 158.) In ruling on the summary-judgment motion, the Court reviewed all the parties' arguments, together with documentary evidence included with the FAC, *Martinez* report, Plaintiff's *Martinez* report response, Defendants' summary-judgment motion, and Plaintiff's

summary-judgment response. (ECF Nos. 75, 75-1 to -36, 97, 97-1, 103, 103-1, 103-2, 104, 104-1 to -5, 153, 153-1 to -46.) The arguments and evidence are considered only as relevant to the question of whether Plaintiff exhausted his administrative remedies regarding the sole remaining issues.[2]

Having determined no hearing is needed, the Court grants Defendants' summary-judgment motion. (ECF Nos. 104, 153.)

## II. SUMMARY-JUDGMENT STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] mere factual dispute will not preclude summary judgment; instead there must be a genuine issue of material fact." *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000). The Court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial." *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (citation modified). "Those specific facts must be supported by particular parts of materials in the record; relying on mere pleadings is insufficient." *Id.* (citation modified). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self*, 439 F.3d at 1230 (citation modified).

[2]One example of a category of documents not considered because of their irrelevance is any "Inmate Request Form" and response to such a form. (*See, e.g.*, ECF Nos. 153-21, -22, -25, -26, -33 to -40.)

## III. LEGAL PRINCIPLES OF ADMINISTRATIVE EXHAUSTION

In passing the Prison Litigation Reform Act of 1995 (PLRA), Congress "impos[ed] a strict administrative-exhaustion requirement . . . [on] civil-rights claims filed by prisoners." *Pakdel v. City and Cnty. of San Francisco*, 594 U.S. 474, 481 (2021) (per curiam) (citing 42 U.S.C.S. § 1997e(a) (2026)). That section states, "No action shall be brought with respect to prison conditions under [42 U.S.C.S. § 1983 (2026)], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.S. § 1997e(a) (2026). The Supreme Court has often emphasized, "[T]hat language is 'mandatory.'" *Ross v. Blake*, 578 U.S. 632, 638 (2016) ("An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies.") (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court.")); *Gray v. Sorrels*, 818 F. App'x 787, 791 (10th Cir. 2020) (unpublished)[3] ("[T]he district court is not authorized to dispense with [the statutory exhaustion requirement]."). "There is no question that . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Indeed, PLRA "requires compliance with 'deadlines and other critical procedural rules,' *Woodford*, 548 U.S. at 90-91, with no exceptions for 'special circumstances.'" *Ramirez v. Collier*,

---

[3] *Gray*, 818 F. App'x 787, is an unpublished opinion, but the Court may rely on unpublished Tenth Circuit opinions to the extent their reasoned analyses are persuasive in the case at bar. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit holds:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

*United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

The Court concludes that *Gray*, 818 F. App'x 787, and the other unpublished cases cited here, have persuasive value as to material issues and will help dispose of the issues in this decision.

595 U.S. 411, 421 (2022); *see Ross*, 578 U.S. at 639 ("PLRA's text suggests no limits on an inmate's obligation to exhaust--irrespective of any 'special circumstances.'"); *Miller v. French*, 530 U.S. 327, 337 (2000) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see also McNeil v. United States*, 508 U.S. 106, 111 (1993) (stating "we are not free to rewrite the statutory text" when Congress has strictly barred "claimants from bringing suit in federal court until they have exhausted their administrative remedies").

The Supreme Court has held that the PLRA requires "proper exhaustion." *Woodford*, 548 U.S. at 90. "Proper exhaustion" intends use of "all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (citation modified); *see also Davis v. Big Horn Cnty. Jail*, No. 23-8089, 2024 U.S. App. LEXIS 21203, at *3 (10th Cir. Aug. 22, 2024) (unpublished) ("'Substantial compliance is insufficient.'" (quoting *Fields v. Okla. State Penitentiary.*, 511 F.3d 1109, 1112 (10th Cir. 2007))); *Plater v. Poirot*, No. 23-6131, 2024 U.S. App. LEXIS 19287, at *1, 8 (10th Cir. Aug. 2, 2024) (unpublished) (stating, if inmates do not finish grievance process or file untimely grievances, inmates are barred from pursuing § 1983 claims for failure to exhaust); *Leatherman v. Corecivic*, No. 22-6084, 2023 U.S. App. LEXIS 4892, at *6 (10th Cir. Feb. 28, 2023) (unpublished) ("'[T]he prisoner's duty to exhaust available administrative remedies is complete' only '[w]hen there is no possibility of any further relief.'" (quoting *Ross v. Cnty. of Bernalillo*, 365 F.3d 1181, 1187 (10th Cir. 2004))). Indeed, the "rules are defined not by PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218; *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) ("Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure." (citation

modified)). The Supreme Court concedes this requirement will stymie some prisoner cases, but observes that a "centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision, § 1997e(a)." *Woodford*, 548 U.S. at 84, 103 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *see also id.* at 103 (responding to argument "that requiring proper exhaustion is harsh for prisoners, who generally are untrained in the law and are often poorly educated," Supreme Court notes "that prisoners who litigate in federal court generally proceed *pro se* and are forced to comply with numerous unforgiving deadlines and other procedural requirements").

An inmate's failure to exhaust is an affirmative defense, *Jones,* 549 U.S. at 216, and the burden is on the defendant to prove the failure to exhaust, *Lakhumna v. Bradbury*, No. 23-4133, 2024 U.S. App. LEXIS 24871, at *7 (10th Cir. Oct. 2, 2024) (unpublished) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)). But, "[w]hen a defendant has established that an inmate did not exhaust his or her administrative remedies, the burden then shifts to the plaintiff to establish the grievance process was unavailable." *May*, 929 F.3d at 1234.

Indeed, PLRA has "its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642. Section 1997e(a)'s exhaustion requirement depends on an administrative remedy's availability. *See id.* As the Supreme Court put it, that means "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The Court further identified three situations "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. Those are: (1) "[W]hen (despite what regulations or guidance materials may promise) [the administrative procedure] operates as a

simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (2) "[A]n administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"--i.e., "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 644 (stating "administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion"). And, (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

A plaintiff's use of a grievance system shows its availability. *See Estrada v. Smart*, 107 F.4th 1254, 1260 (10th Cir. 2024) ("DeCesaro further established that Estrada had filed three grievances on unrelated topics in the year following the shooting, which ranged from May 1, 2018, to May 30, 2019. Thus, the CDOC grievance system was "available" to Estrada, and he utilized it three times in the year following the courthouse shooting. But, as DeCesaro established, Estrada did not file a grievance for the courthouse shooting."); *see also Brown v. Schnurr*, No. 22-3183, 2023 U.S. App. LEXIS 20954, at *7, 9, 11 (10th Cir. Aug. 11, 2023) (unpublished) (agreeing that, given his "robust history of grievances . . . [plaintiff] was clearly familiar with how that process should work yet failed to timely avail himself of the administrative remedies that are a prerequisite to his § 1983 claims," and that plaintiff "demonstrated he could submit a grievance when he attempted to submit the untimely form").

## IV. UNDISPUTED MATERIAL FACTS[4]

**A.** As published on January 1, 2009, but "never provided"[5] to Plaintiff, SCJ's grievance policy contained the following relevant terms and requirements:

**1.** There were three levels.

**2.** Inmates must "submit their complaints in writing, listing all relevant information" and "provid[ing] the grievance deputy with a clear understanding of the claims and issues raised by inmates."

**3.** "The inmate has the burden of providing all relevant facts and information . . . ."

**4.** "Completed grievance forms should be forwarded to the grievance sergeant."[6]

**5.** The time limits were

**a.** "seven days from the precipitating event for the inmate to file a grievance";

**b.** "seven days to complete the staff response at level one";

**c.** "three days for the inmate to request a review by the Deputy Jail Commander after receiving the written level one decision";

**d.** "if a review is required, seven days for the Deputy Jail Commander to provide a written response";

[4]These undisputed material facts are designated as such *only* for this Order's purposes.

[5]These two words are found in Plaintiff's declaration. (ECF No. 153-4, at 3.)

[6]Throughout his summary-judgment-response materials, Plaintiff seems to use "grievances" and "requests" interchangeably. But, the grievance policy is clear here: "Completed grievance forms" were the vehicle used for grievances. The Court thus disregards all "requests" submitted and discussed by Plaintiff as ways that he may have complied with the grievance policy. Only "grievances" are considered as ways that Plaintiff may have complied with the grievance policy.

**e.** "24 hours for the inmate to request a review by the Jail Commander after receiving the written level two decision";

**f.** "if a review is required, seven days for the Jail Commander to provide a written response."

**6.** A "precipitating event" was "a specific event or the time when the inmate knew or should have known about a grievable situation."

**7.** "Fixed time frames are applicable to each level of the grievance with the inmate becoming entitled to move to the next stage upon the expiration of a staff time limit, unless the Deputy Jail Commander grants an extension."

**8.** "The inmate must mark the grievance box on the inmate request form in order for it to be processed as a grievance."

(SC Jail (SCJ) policies and procedures manual, ECF No. 97-1, at 29-30, 33-38; Pl.'s Decl., ECF No. 153-4, at 3.)

**B.** At the relevant times, Defendants were employed by SC. (ECF No. 75, at 4; Nielsen Decl., ECF No. 97-1, at 4.)

**C.** Beginning April 1, 2017, Plaintiff was held at SCJ as a pretrial detainee. (Nielsen's 2d Decl., ECF No. 104-3, at 3; 153-4, at 3.) Plaintiff then "spent approximately eighteen days in a non-housing area where [he] was shackled for outside recreation" and not allowed to attend religious services and had "no[] immediate[] access to any policies or procedures." (ECF No. 153-4, at 3.)

**D.** Throughout his SCJ stay, "[o]n a regular basis [Plaintiff] would file grievances or request review of grievances." (*Id.*)

**E.** On April 18, 2017, Plaintiff "was moved to a housing unit but remained locked in a cell for at least ten more days." (*Id.*) In the housing unit, Plaintiff "was provided . . . a small book . . . dated 11-11-2011." (Pl.'s resp. to Defs' *Martinez* rep't, ECF Nos. 103, at 3; 153-4, at 3.) Defendants gave Plaintiff "a copy of the Inmate Handbook, effective January 12, 2016." (Def's Resp. to Interrog. 3, ECF No. 153-2, at 11; SCJ Inmate Handbook, ECF No. 153-5, at 2.) "The Inmate Handbook describe[d] the grievance process in which inmates are afforded a system 'to address complaints or other concerns,' which would include Mr. Christensen's disciplinary actions." (ECF No. 153-2, at 13.) "[T]he book indicated that there were only two levels to grievance process at SCJ," (ECF No. 153-4, at 3), reading in pertinent part as follows:

> Inmates shall be afforded a formal grievance system to address complaints or other concerns. This system shall be fully documented at all levels. This system is not a right, but a process given to inmates to voice their concerns. The process is as follows:
> A. Submit, in writing, your complaints or concerns, listing all relevant information on a grievance form within 7 days of the event.
> B. You must provide a clear understanding of your claims to the grievance sergeant.
> C. Inmates shall make reasonable attempts to resolve the matter informally prior to filing a formal grievance action.
> D. The grievance sergeant will review and document his findings and return the grievance. At which point, you can accept the findings or request a Level Two Review within 3 days, which you will forward to the Jail Commander or designee.
> E. Abuse of the grievance system may result in limited access or loss of access to the grievance system, as well as possible disciplinary actions.

(ECF No. 153-5, at 18.)

**F.** A blank "Inmate Grievance Form," which an SCJ inmate was required to fill out and file to launch a grievance process contained the following "Section 1" portions for the inmate to complete: **1.** "Specific nature of grievance (who, what, when, where and How?)," followed by several lines for the inmate to relate such information; **2.** "Identify those contacted regarding

your grievance and state what YOU HAVE DONE to resolve the issue," followed by blank lines to relate such information; **3.** "What is the specific remedy you seek?," followed by blank lines to relate such information. (*See, e.g.*, ECF No. 153-14.)

Each blank "Inmate Grievance Form" also contained a "Section 2," which was labeled, "STAFF RESPONSE (INFORMAL)" and was "[t]o be completed by Captain, Lieutenant, EMRS, or Social/Case Worker," stating "[w]hat decision" was made or "what action" was taken, "in response to this grievance, by the staff member. (*See, e.g.*, ECF 153-15, at 2.) After Section 2, the following language was written: "If you have not resolved the grievance at the informal level and wish to appeal to Level Two (formal), the inmate must complete Section 3 and forward to the grievance coordinator . . . ." (*Id.*) "Section 3" was "[t]o be completed by inmate," who was to answer the question, "Why is the Informal Response unacceptable? (Be Specific)." (*Id.*)

**G.** "On or around April 28, 2017, [Plaintiff] was removed from lockdown." (ECF No. 153-4.)

**H.** "Around April 30, 2017, Defendants Braithwaite, Bown, Christensen, Imlay, Nielsen, and Sgt. Nunley kept Plaintiff from attending church services; for 'safety' and 'security reasons.' (ECF Nos. 75, at 10; 75-34, at 13.)" (ECF Nos. 85, at 14; 138; 153-4, at 4.)

**I.** On May 20, 2017, Plaintiff apparently assaulted another inmate. (SCJ Incident Log Rep't, ECF No. 97-1, at 147; SCJ disciplinary form, ECF No. 97-1, at 154.) Plaintiff was therefore given written charges of "A-02" [assault] and "B-02" [horseplay], signed by Defendant Braithwaite, as "screening supervisor." (ECF Nos. 97-1, at 154.) On May 25, 2017, "based on video evidence and without allowing [Plaintiff] to bring witnesses," Plaintiff was found guilty by Defendant Neill (hearing officer) and sentenced to "30 days PI [punitive isolation] . . . less the time served (3 days) . . . end[ing] 6/21/17." (SCJ disciplinary findings, ECF No. 97-1, at 155; 153-4, at 4.)

**J.** On May 25, 2017, Plaintiff filed a level I grievance regarding the situation leading to his disciplinary proceedings. (ECF No. 97-1, at 231.) More specifically, he stated the nature of the grievance as follows:

> Negligence and unprofessional duties of officers here at the Sanpete County Jail! Officer Christensen was informed twice that I know of by inmate Ryan of an escalating situation within our unit. He did nothing about it. On the 25th of May 2017 Officer Brown informed me he knew about the situation and reported it to his Sgt. Female [] Nunnly. "He stated she was busy and forgot to address the situation." After my hearing, I spoke to Sgt. Nunnly on my way back to my cell. She completely acted like she was unaware of the situation but after speaking to Officer Brown I found that to be untrue!
>
> The write up officer went by the prison guidelines for state inmates[;]however, I'm not a state inmate! By neglecting a safety concern by us inmates and the situation left unattended shame on us for policing ourselves. Had the several officers informed of the situation that was ongoing for at least 3 weeks or longer done anything about it this situation would never have happened!
>
> . . . .
>
> Also, I'm locked down with 1 hr out every 3 days, no TV, no phone, no cleaning supplies, no canteen or commissary, no visits. . . .
>
> . . . .
>
> What is the specific remedy you seek? To be released from lock down and placed to the normal status I was before the situation erupted. For the staff to have a meeting and be on the same page that when inmates bring safety concerns to their attention not to just ignore them or let things go unnoticed for several weeks! Because had staff done their job and not neglected to handle the situation for several weeks, there wouldn't have been a problem to begin with! So punishing somebody who was left to police his self should not be punishable by those who refused to do their real job. Thank you! If so then the officers should be reprimanded as well.

(ECF No. 97-1, at 231.)

On June 4, 2017, Defendant Bailey responded to the grievance, determining "No Action Taken" and noting, "There were no written requests stating that there was going to be a physical

altercation, nor did anyone tell the officers that the situation was that bad." (ECF No. 97-1, at 227, 232; Staff Resp., ECF No. 153-15, at 2.)

Plaintiff "did not file a Level II Grievance." (ECF No. 97-1, at 227.)[7]

**K.** On June 22, 2017, Plaintiff's "thirty-day lockdown sanction was completed." (ECF No. 153-4, at 4.) However, Plaintiff "was retaliated against by Defendants Nielson and G. Nunley for filing grievances and served thirty additional days in lockdown."[8] (*Id.*) Plaintiff later declared, "Because of the threat of being retaliated against by prison officials, [Plaintiff] was deterred from filing grievances on this issue." (*Id.*)

**L.** On June 29, 2017, Plaintiff filed a level I grievance regarding the alleged violation of his Eighth Amendment rights, when he, among other things, **1.** assaulted another inmate, and was thus placed in lockdown and lost all privileges, which was more harsh disciplinary punishment from that of other inmates who assaulted fellow inmates; **2.** was "double punished only coming

---

[7]The issue of whether Plaintiff filed a level II grievance here is arguably in dispute. That is because the summary-judgment response's version of Defendant Bailey's response shows no additional writing by Plaintiff, (ECF No. 153-15), while the *Martinez* report version of Defendant Bailey's response shows additional writing by Plaintiff, (ECF No. 97-1, at 232). It is unclear whether that additional writing is meant as a level II grievance or was overflow from Plaintiff's writing of the level I grievance, or simply added on another date but not representing part of the grievance process. The additional writing states,

> Not once was or did I mention the TV being a problem. The guy's attitude was the problem. His actions were disrespecting inmates bullying over [illegible] TV, the chairs N so forth. So the officers were just sweeping this under the rug to cover they failed to do their job! Because regardless how small the problem is when any inmate comes forward to help deescalate a problem they probably don't want to be labeled as a snitch for even bigger safety reasons. So rather it's over the TV or other things regardless when an officer is made light of a situation it is their job to secure the situation. They admit they knew of the problem yet still chose not to do anything! So once again if we are left to police ourselves then I should not be punished by the police who failed to do their job. A guy says I'm super depressed. You do nothing about it because 100 guys before him took no action but this guy jumps off the top tier. Who's responsible? So what's the difference? I would just request to be off lockdown after my 30 days is up.

(*Id.*)

[8]"Retaliation" is the actual cause of action, so this language constitutes a legal conclusion that will not be accepted as such in this Order.

out from 4pm - 10pm with no rec yard"; **3.** was at SCJ for "three months" without "religious services other than 1 1 on 1 with a religion [he] do[es]n't practice"; and **4.** was retaliated against, for filing grievances, by "lock down, [and lack of] outside rec, and library." (Inmate Grievance Form, ECF No. 75-17, at 3-4; 97-1, at 8, 12-13, 142-43, 227; Nielsen 2d Decl., ECF No. 104-3; ECF Nos. 153-2, at 13; 153-16.) On July 7, 2017, Defendant Nielsen responded to Plaintiff's grievance, explaining that **a.** his segregation from other SCJ inmates was not punitive, but for their joint protection; **b.** his "maximum security" classification was based on his "criminal history and the crime" he was awaiting trial on; **c.** Plaintiff would be given religious opportunities that do not interfere with SCJ's security, including meeting with clergy; and **d.** "[o]utside recreation is a privilege." (Grievance resp., ECF Nos. 75-17, at 5; Nielson Decl., ECF No. 97-1, at 8-9, 14; ECF Nos. 97-1, at 144-45; 104-3; 153-17.) Plaintiff did not file a level II grievance.[9] (ECF Nos. 97-1, at 9, 227; 104-3; 153-2, at 15.)

**M.** On August 31, 2017, Plaintiff filled out "Inmate Grievance Form," discussing legal-access issues. (ECF No. 75-19, at 2-5.)

**N.** On September 19, 2017, Plaintiff filled out a level II grievance, saying "You never responded from 8-31-17." (ECF Nos. 75-20, at 3-5; 153-18.) In the level II grievance, he raised legal-access issues to talk about his eighteen days "in a cell in booking, . . . plus 10 days after that," and how he was "handcuffed like an animal to go outside by [him]self with a guard." (ECF Nos. 75-20, at

[9]On Defendant Nielsen's declaration (attached to Plaintiff's FAC) where it says, "Inmate Christensen did not file a Level II Grievance," Plaintiff apparently handwrote above that sentence, "(Not true)"; and, "Exhibit 18"; and, "They never answered Level II." (ECF No. 75-34, at 7.) First, the Court notes that Plaintiff's handwritten notes on another person's declaration do not qualify as evidence to be considered under summary-judgment rules. And, second, Exhibit 18 appears to be irrelevant because it addresses only legal-access issues, not attendance at religious services. (ECF No. 75-18.)

3-5; 153-18.) On September 25, 2017, Defendant Bown responded, "The grievance process has three levels," then discussed legal-access issues, before stating, "no further action is necessary." (ECF No. 75-20, at 6; Bown Decl., ECF No. 75-33, at 4; ECF No. 153-19.) On October 4, 2017, Defendant Bown responded "to [Plaintiff's] Level II grievance," saying he could "find nothing from [Plaintiff] dated 8/31/2017." (ECF Nos. 75-20, at 7; 153-20.) Bown then stated, "Your housing has been explained to you on several occasions and is only based on your classification. . . . Classification decisions of an inmate has no punitive intent and are simply intended to further the safety, security, order and control interests of the jail's operations." (ECF Nos. 75-20, at 7; 153-20.)

**O.** On November 10, 2017, Plaintiff filed a level I grievance alleging constitutional violations--i.e., retaliation[10] and disallowance of church.[11] (ECF Nos. 75-21, at 3-7; 97-1, at 228, 238-342; 153-23.)

**P.** On November 13, 2017, Plaintiff filed this action. (ECF No. 4.)

**Q.** On December 6, 2017, Sgt. Bailey, apparently responding to Plaintiff's November 10, 2017 grievance, stated, "No action taken . . . all the concerns you have grieved have been addressed previously." (ECF Nos. 75-21, at 8; 97-1, at 228, 243.) Plaintiff "did not file a Level II Grievance."[12] (ECF No. 97-1, at 228.)

---

[10]Plaintiff says he "turned in a request on 10-30-17 after [his] evening rec yard was taken for no reason." (ECF No. 153-23.) This is not a claim included in the FAC and is therefore disregarded going forward.

[11]Plaintiff says, "So you allow me to live with state inmates but you won't allow me church with them." Dkt. No. 75-21, at 7.

[12] On Bailey's declaration (attached to Plaintiff's FAC) where it says, "Inmate Christensen did not file a Level II Grievance," Plaintiff apparently handwrote above that sentence, "Not true"; and, "Exhibit 22"; and, "I had to refile because more than 30 days passed before they answered." (ECF No. 75-34, at 11.) First, the Court notes again that Plaintiff's handwritten notes on someone else's declaration do not qualify as evidence to be considered under summary-judgment rules. Second, Exhibit 22 appears to be irrelevant because it addresses only legal-access and

**R.** Around December 14, 2017, Plaintiff changed his religious designation to ASATRU. (ECF No. 153-32.)

**S.** On March 10, 2018, Plaintiff filed a level I grievance, saying, "I want to attend church services." (ECF No. 75-23, at 2.) In that grievance, Plaintiff challenged Sgt. Bailey's response to a past request of Plaintiff's in which Bailey said he has not "been allowed church services for safety reasons." (*Id.* at 3.) Regarding denial of his requests to attend religious services "for 9 months . . . 12 months total," Plaintiff alleged, "I've never been given due process to decide if my going to church is a safety concern." (ECF Nos. 75-23, at 2-4; 153-27.) On March 15, 2018, Defendant Bailey responded, "No Action Taken," and without addressing past instances of Plaintiff being denied church services, said prospectively, "You will not be allowed to go to church services with other inmates for SAFETY REASONS. You may meet with any of the religious volunteers one on one if they wish to do so." (ECF Nos. 75-23, at 5; 153-28.) On March 16, 2018, Plaintiff filed "Grievance Appeal," reiterating his arguments about attending church, then adding assertions of being kept "on administrative segregation" and with inmates with whom he had "conflicts," and again raising the issue of being "held . . . in booking for 18 days plus 10 more days in lock down without due process." (ECF Nos. 75-23, at 6-9; 153-29.) On March 19, 2018, Defendant Bown responded to Plaintiff,

> as to your Level II grievance I assume, received by me on 03/19/2018, I am unsure as to how to answer. You send me three and one half pages of complaints and what appears to be case law that you think may justify your cause. You tie my hands as how to answer, by giving me a blank grievance form, claiming that you are appealing the answer you received. I have not seen your answer. Again I have no way to respond and give you a proper answer.

---

inmate-account issues, not attendance at religious services. (ECF No. 75-22.) And, three, the answer for the November 10th grievance was done December 6, so Plaintiff is wrong that "more than 30 days passed." (ECF No. 75-21, at 3-8.)

(ECF No. 153-30.) Also on March 19, 2018, Plaintiff replied that he continues to "request . . . church service," regardless of the alleged "security" concerns posed by SCJ employees. (ECF No. 153-31.) On March 21, 2018, in finding that Plaintiff was "given a proper answer" to his past challenges, Defendant Bown (in answer to Plaintiff's "Level II grievance") explained SCJ's policy vis-à-vis the practice of Plaintiff's recently-stated religion of ASATRU. (ECF No. 153-32.)

**T.** "[A]round April 16, 2018, [Plaintiff] became aware that Defendants Bennett[] and Braithwaite took [his] tax refund check without justification and deprived [Plaintiff] of its use." (ECF Nos. 85, at 23-24; 153-4, at 4.)

**U.** The Inmate Handbook effective January 7, 2019, was updated to reflect the SCJ Policies and Procedures Manual which provided for three levels of review for grievances, (ECF No. 153-2, at 5), reading in pertinent part as follows:

> Inmates shall be afforded a formal grievance system to address complaints or other concerns. This system shall be fully documented at all levels. This system is not a right, but a process given to inmates to voice their concerns. The process is as follows:
> A. Submit, in writing, your complaints or concerns, listing all relevant information on a grievance form within 7 days of the event.
> B. You must provide a clear understanding of your claims to the grievance sergeant.
> C. Inmates shall make reasonable attempts to resolve the matter informally prior to filing a formal grievance action.
> D. The grievance sergeant will review and document his findings and return the grievance. At which point, you can accept the findings or request a Level Two Review within 3 days, which you will forward to the Jail Lieutenant or designee. At which time, you can accept the findings or request a Level Three Review within 3 days, which you will forward to the Jail Commander or designee.
> E. Abuse of the grievance system may result in limited access or loss of access to the grievance system, as well as possible disciplinary actions.

(ECF No. 153-6, at 18.)

**V.** On August 1, 2019, Plaintiff filed "Inmate Grievance Form" stating, "I went to IDHO disciplinary hearing, he threatened to write me up for filing to[o] many appeals or paperwork. (Stating I abused the process.)" (ECF No. 153-41.) On August 2, 2019, Sgt. Bailey responded, "No Action Taken." (ECF No. 153-42.) On August 3, 2019, Plaintiff filed "Level II Grievance Appeal." (ECF No. 153-43.) Among other issues, Plaintiff mentioned the following allegations relevant to this action:

> **1.** "You made me declare a sect in order to get religious accommodations i.e. 'diet meal.' Then used by declared sect [Asatru] against me. Refusing other services" and a general discussion of religious freedoms. (*Id.*)
>
> **2.** "You kept me in booking for 18 days then locked me down 10 days in a cell without ever providing 'due process' 14th Amendment 'right.'" (*Id.*)
>
> **3.** Plaintiff was "shackled in order to go to rec yard . . . [with] no due process provided . . . [for] two months." (*Id.*)
>
> **4.** "After completing my disciplinary lock down, you kept me locked down 30 more days for no reason without due process. You wouldn't even let me go outside for 45 days for no reason. (That is punishment.)" (*Id.*)

On August 8, 2019, Defendant Bown answered Plaintiff's level II grievance from August 3, 2019, stating,

> All of the issues that you bring up have been addressed by Sanpete County Jail staff, to you on several occasions, through the Grievance process and also the Courts. You have been put on Administrative Segregation from the day you came to our jail, in the interest of safety and security of you, other inmates, staff, the citizens of Sanpete County and the Sanpete County Jail itself. The Grievance System has three levels and always has. The disciplinary System has only one appeal available. It is an administrative tool not a criminal procedure. . . . Outside yard is a privilege, it is not a right!

(ECF No. 153-44.)

Plaintiff dated his "1st Level => Level III Grievance" August 9, 2019. (ECF No. 153-46.) Some possibly pertinent parts of that grievance are as follows:

**a.** "You decided and you put me on administrative segregation the day I got [to SCJ] without providing due process." (*Id.*) "You kept me in receiving nonhousing areas over 24 hrs. (18 days)." (*Id.*)

**b.** "You stole my state tax money 100% of it without permission or consent." (*Id.*)

**c.** "You deprive me church . . . 2 1/2 years." (*Id.*)

**W.** On August 13, 2019, Plaintiff filed the FAC. (ECF No. 75.)

**X.** On March 11, 2020, Plaintiff notified the Court that he moved to Central Utah Correctional Facility. (ECF No. 78.)

## V. ANALYSIS

With this backdrop of law and facts, the Court concludes that it is undisputed that SCJ had a grievance process and therefore Plaintiff was required to complete that grievance process, as available, before bringing this federal civil-rights action. What follows below is a claim-by-claim and grievance-by-grievance discussion explaining that Plaintiff did not properly file grievances to appropriate levels--whether it be level II or III--as required by SCJ policy. So, despite Plaintiff's arguments to the contrary, Defendants have met their burden of showing Plaintiff's failure to exhaust administrative remedies. That shifts the burden to Plaintiff, who unsuccessfully argues grievance unavailability as to Plaintiff's retaliation claim. *See Ross*, 578 U.S. at 643-44.

**A. Free Exercise Claim**

Plaintiff alleges that his federal constitutional rights were violated when, on April 30, 2017, he "was not allowed church service." (ECF No. 75, at 10.) Thus, under SCJ's policy, to begin the grievance process, Plaintiff should have brought his first grievance within seven days of April 30, 2017--or May 7, 2017. (ECF No. 153-4.) Yet the first grievance he brought on the subject of his religious rights was filed fifty-three days later, on June 29, 2017. (ECF No. 97-1, at 12.) By itself, this failure to comply with SCJ's deadlines could be enough to dismiss Plaintiff's free-exercise claim. *See Ramirez*, 595 U.S. at 421 (holding PLRA "requires compliance with 'deadlines and other critical procedural rules,' *Woodford*, 548 U.S. at 90-91, with no exceptions for 'special circumstances'"); *Hardeman v. Smith*, 764 F. App'x 658, 662 (10th Cir. 2019) (concluding procedural error of untimely filing of grievance could not be "overlook[ed]" when determining inmate-plaintiff failed to exhaust); *see also Jones*, 549 U.S. at 211 ("All agree that no unexhausted claim may be considered.").

However, Plaintiff argues this is not enough because "Defendants[] considered [Plaintiff's] concerns on the merits and/or never took issue with the fact that the grievance or the request to review the grievance was untimely." (*E.g.,* ECF No. 153, at 12.) Perhaps here Plaintiff relies on this rule stated by the Supreme Court: "If a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court." *Ross*, 365 F.3d at 1186.

Below, each grievance process, in which Plaintiff mentioned denial of religious services, is analyzed for its exhaustion potential.

**1. Starting June 29, 2017**

In the grievance process starting June 29, 2017, Plaintiff did not specifically address the alleged April 30, 2017 breach of his religious rights , but instead bunched April together with his total of "three months" at SCJ, in which he alleged he "never had religious services, other than 1 1 on 1 with a religion I don't practice!" (ECF No. 97-1, at 12.) And, Defendant Nielsen did answer the June 29th grievance on the merits. (ECF No. 75-17, at 5.) But, even if consolidating these dates made it okay for Plaintiff to wait until June 29th to grieve an event occurring on April 30th, Plaintiff still "did not file a Level II Grievance," once Defendant Nielsen answered,[13] (ECF No. 75-34, at 7); under SCJ guidelines, Plaintiff had three days from July 7, 2017, in which to do so. (ECF No. 153-4). Plaintiff's failure to finish this grievance process means Plaintiff did not exhaust his administrative remedies here. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

[13]Plaintiff

> disputes the allegation that he did not request a second-level review of the June 29, 2017, grievance regarding his inability to attend church services. As discussed below, [Plaintiff] requested subsequent reviews of this issue on November 10, 2017, March 6, 2018, March 10, 2018, March 16, 2018, March 19, 2018, July 4, 2018, and April 28, 2019.

(ECF No. 153, at 6.) Plaintiff's summary-judgment response adds to these dates "August 3, 2019, and August 9, 201[9]." *Id.* at 11. Plaintiff adds the following citation sentence in support of his arguments: "(*See* Christensen Decl., ¶¶ 19-21; *see* Chart of Grievances, attached as Exhibit 6; *see also* Index of Allegations – First Amendment Free Exercise Claim, attached as exhibit 7; *see* Grievances, attached as Exhibits 15, 22, 24, 26, 28, 30, 36, 38, 42, 45.)" (ECF No. 153, at 11-12.)

But, as this Order's section on Plaintiff's religious-rights claim illustrates, each grievance process begins with a level I grievance that must be timely filed at the start. (ECF No. 97-1, at 33-35.) Within each grievance process is the two levels that Plaintiff was aware of before September 25, 2017, and three levels that he was aware of after that date. (ECF Nos. 75-20, at 6; 153-5, at 18.) The grievances at additional levels must be filed on a strict timeline. (ECF No. 97-1, at 35.) And, if grievance responders do not respond to late claims on the merits, the belated filing is not transformed into a proper filing. *See Ross*, 365 F.3d at 1186. As the discussion in this section of the Order concludes, none of Plaintiff's grievance processes regarding church services on April 30, 2017 were timely filed, then the grievance processes were invalidated by not being filed to level II or level III, and/or not being answered on the merits. Also, an inmate "request" is not the same as an inmate "grievance" and does not serve to exhaust the grievance process. (*See, e.g.*, ECF No. 153-37, 153-39.)

**2. Starting November 10, 2017**

Next, Plaintiff argues that he started a grievance process on November 10, 2017, that served to exhaust his religious-exercise claim. On that date, Plaintiff filed a level I grievance in which, out of five pages listing forty-one issues, he made this allegation: "So you allow me to live with state inmates but you won't allow me church with them." (ECF No. 75-21, at 3-7.) But even if this vague language could be interpreted to refer to Plaintiff's lack of churchgoing on April 30, 2017, it would have been filed 187 days late. After all--again--Plaintiff should have brought his first grievance within seven days of April 30, 2017--or May 7, 2017. (ECF No. 153-4.) And Plaintiff's argument about a belated filing being rendered timely by a decision on the merits does not work here either. That is because, on December 6, 2017, Sergeant Bailey responded, "No action taken. . . . All the concerns you have grieved have been addressed previously . . . ." (ECF No. 75-21, at 8.) This grievance process was further invalidated by Plaintiff's failure to "file a Level II Grievance." (Bailey decl., ECF No. 75-34, at 11.) Thus, Plaintiff did not exhaust his administrative remedies here.

**3. Starting March 10, 2018**

On March 10, 2018, Plaintiff filed a Level I grievance, saying, "I want to attend church services." (ECF No. 75-23, at 2.) In that grievance, Plaintiff challenged Sgt. Bailey's response to a past request of Plaintiff's in which Bailey said he had not "been allowed church services for safety reasons." (*Id.* at 3.) Regarding denial of his requests to attend religious services "for 9 months . . . 12 months total," Plaintiff alleged, "I've never been given due process to decide if my going to church is a safety concern." (ECF Nos. 75-23, at 2-4; 153-27.) This latter timeline ("12

months total") takes in the claim date of April 30, 2017, which--once more--should have been grieved by May 7, 2017.

On March 15, 2018, Defendant Bailey responded, "No Action Taken," and--without addressing past instances of Plaintiff being denied church services--said prospectively, "You will not be allowed to go to church services with other inmates for SAFETY REASONS. You may meet with any of the religious volunteers one on one if they wish to do so." (ECF Nos. 75-23, at 5; 153-28.)

On March 16, 2018, Plaintiff filed "Grievance Appeal," reiterating his arguments about attending church, then including others unrelated to church. (ECF Nos. 75-23, at 6-9; 153-29.)

On March 19, 2018, Defendant Bown responded to Plaintiff,

> as to your Level II grievance I assume, received by me on 03/19/2018, I am unsure as to how to answer. You send me three and one half pages of complaints and what appears to be case law that you think may justify your cause. You tie my hands as how to answer, by giving me a blank grievance form, claiming that you are appealing the answer you received. I have not seen your answer. Again I have no way to respond and give you a proper answer.

(ECF No. 153-30.) Also on March 19, 2018, Plaintiff replied that he continues to "request . . . church service," regardless of the alleged "security" concerns posed by SCJ employees. (ECF No. 153-31.)

On March 21, 2018, in finding that Plaintiff was "given a proper answer" to his past challenges, Defendant Bown (in answer to Plaintiff's "Level II grievance") explained SCJ's policy vis-à-vis the practice of Plaintiff's recently-stated religion of ASATRU. (ECF No. 153-32.)

It is important to note that, on September 25, 2017, Plaintiff was put on notice by Defendant Bown that "[t]he grievance system has three levels." (ECF No. 153-19.) Yet, here, Plaintiff did not file a level-three grievance as required. (ECF Nos. 153-30, -31, -32.)

Based on these facts, Plaintiff did not adequately exhaust his administrative remedies as to his lack of church access on April 30, 2017. First, the level I grievance filed on March 10, 2018, was filed 314 days after April 30, 2017--about 307 days too late. Second, the grievance response did not address past times when church was denied to Plaintiff (i.e., April 30, 2017), and therefore did not address the merits here and rescue Plaintiff's untimeliness. Finally, after being notified that the grievance process had three levels, Plaintiff did not file a level-three grievance, leaving the grievance process unfinished. This all means Plaintiff did not here exhaust the claim regarding April 30, 2017.

**4. Starting August 1, 2019**

Finally, more than two years after April 2017, Plaintiff filed a level-one grievance on August 1, 2019, that did not address religious services, but instead was about an "I.D.H.O. disciplinary hearing," in which Plaintiff was "threatened" with being written "up for filing too many appeals or paperwork." (ECF No. 75-11, at 21.) On August 2, 2019, Sergeant Bailey responded,

> Inmates can be written up for abuse of the appeals process[;] they can even be written up for abuse of the grievance process. Therefore, the statement that Mr. Niel said to you is true. You can be written up for abuse of these processes . . . . Your rights have not been violated. . . . No action taken.

(ECF No. 75-11, at 23.)

But Plaintiff's August 3, 2019 "Level II Grievance Appeal" then generally posed, among other things, the allegations that Plaintiff was disallowed "church service," forced to "declare a

sect [for] religious accommodations, and refused services given "other Asatru members." (*Id.* at 25-26.) This grievance appeal is clearly well out of time regarding denial of church services on April 30, 2017. This grievance also raised these religious topics when religion was not brought up in the level I grievance. (*Id.* at 21, 23-28.) Meanwhile, the SCJ's grievance process, represented by its form, called the level II grievance an "appeal." (*Id.* at 23.) By going beyond the topic of his level-one grievance, Plaintiff invalidly raised unrelated religious topics, which was an impermissible response to the level II question, "Why is the Informal Response [to the level I grievance] unacceptable? (Be Specific)." (ECF No. 75-11, at 23.)

On August 8, 2019, Defendant Bown answered this grievance appeal, stating in pertinent part,

> All of the issues that you bring up have been addressed by Sanpete County Jail staff, to you on several occasions, through the Grievance process . . . . The Grievance System has three levels and always has. . . . You declared that you are of the ASATRU religion. Sanpete County does not have and cannot find, an ASATRU leader willing or available to come to the jail to conduct services.

(*Id.* at 29.) This answer shows Bown did not waive this grievance process's untimeliness or vary from the level I topic; after all, Bown did not answer Plaintiff's appeal on the merits, except for the issue of SCJ's inability to find "an ASATRU leader willing or available to come to the jail to conduct services." (ECF No. 75-11, at 29.) The latter issue of course is irrelevant to Plaintiff's lack of churchgoing on April 30, 2017, because he had not yet declared himself to follow the ASATRU religion at that time. (ECF No. 153-32.)

The FAC has an attachment showing a level III grievance that Plaintiff purports he prepared, dated August 9, 2019, containing his statement, "You deprive me church . . . 2 1/2

years." (ECF No. 75-11, at 33.) But there is no record of it having been received by Defendants, nor of it having been responded to by Defendants.

Based on all this, it is clear that **a.** Plaintiff did not timely file this August 1, 2019 level I grievance regarding churchgoing in April 2017; and **b.** the grievance response was not on the merits of Plaintiff's lack of church attendance on April 30, 2017, and so did not rescue the August 1, 2019 grievance process from its untimeliness and Plaintiff's failure to raise churchgoing in the level I grievance (which made it unappealable in a subsequent level grievance). The state of the record, however, leaves it unclear whether Plaintiff left the grievance process unfinished. Without considering the latter, though, the Court determines that this all means that Plaintiff's grievance process starting August 1, 2019, did not exhaust his claim regarding denial of religious services on April 30, 2017.

**5. Summary**

Regarding Plaintiff's claim of religious deprivation occurring on April 30, 2017, Defendants met their burden of showing that Plaintiff did not adequately comply with SCJ's grievance policy and therefore failed to exhaust his administrative remedies on this issue. Plaintiff's free-exercise claim is thus dismissed.

**B. Due Process Claims**

Plaintiff alleges that his federal due process rights were violated when he stayed in a receiving area from April 1-18, 2017, while being shackled for outside recreation; was placed in administrative segregation on April 18, 2017; and was found guilty of disciplinary charges on May 25, 2017. (ECF Nos. 75, at 14; 75-3, at 3; 75-34, at 13.) The following discussion will move

in chronological order through the undisputed material facts and grievances relevant to Plaintiff's three due-process claims.

**1. Starting May 25, 2017**

On May 25, 2017, in a SCJ disciplinary proceeding, Plaintiff was found guilty of assault and horseplay and sentenced to "30 days PI." (ECF No. 97-1, at 154-55; 153-4, at 4.) Also on May 25, Plaintiff challenged the disciplinary decision in a level I grievance. (ECF Nos. 97-1, at 227, 231; 153-2, at 13; 153-14, at 2.) But the issues Plaintiff challenged in the grievance are not the same ones Plaintiff challenges in this lawsuit. The grievance called out SCJ's officers for not calming an escalating situation in his unit. (ECF No. 97-1, at 231.) Plaintiff asserted certain SCJ officers were warned in advance of tensions and "safety concerns" building between inmates but the officers neglected to intervene, leaving him to "police his self," by engaging in behavior deemed to be assault and horseplay. (*Id.*) Meanwhile, Plaintiff's claim from the FAC at issue here is that he was not afforded due process in his disciplinary hearing. (ECF Nos. 75, at 14; 75-3, at 3; 75-34, at 13.)

However,

> the administrative grievance must have alleged the same facts as the court complaint. A court claim that was not alleged at the administrative level could not have been exhausted there. Without this requirement, the prison would not have had a chance to correct an error. *See Woodford*, 548 U.S. at 94 ("Requiring proper exhaustion . . . gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors."). Although "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim . . . it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

*Williams v. Wilkinson*, 659 F. App'x 512, 514 (10th Cir. 2016) (unpublished); *see also Brewer v. Gilroy*, 625 F. App'x 827, 832 (10th Cir. 2015) (unpublished) ("Here, we have little difficulty

concluding Mr. Brewer's claims against Defendants Riddle and Pinley are barred for failure to exhaust administrative remedies. Although Mr. Brewer filed an administrative grievance regarding the alleged sexual assault, he did not assert the constitutional claims he now brings against these defendants for failure to adequately investigate his allegations."); *Barnes v. Allred*, 482 F. App'x 308, 311-12 (10th Cir. 2012) (unpublished) ("[A] grievance satisfies § 1997e(a)'s exhaustion requirement only 'so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally.'" (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1283, 1285 (10th Cir. 2006))).

Looking at the level of detail necessary to comply with SCJ grievance procedures, *Jones*, 549 U.S. at 218, the Court reviews the language of the SCJ "Inmate Handbook, effective January 12, 2016," which states that a grieving inmate must "list all relevant information on a grievance form" and "provide a clear understanding of your claims to the grievance sergeant." (ECF No. 153-5.) The grievance form reflects these priorities, requiring an inmate to write out the "Specific nature of grievance (who, what, when, where and How?)" and state "the specific remedy" sought." (ECF No. 97-1, at 231.) At the very least, it seems reasonable to conclude that the applicable legal principles, together with SCJ's particular requirements for detail in grievances, require grieving inmates to state enough information that SCJ's grievance staff would know whether to review a situation for due process in a disciplinary hearing (Plaintiff's cause of action here), versus cruel-and-unusual punishment in a potential failure-to-protect-from-a-safety-concern scenario (Plaintiff's grievance subject matter).

Regarding the required level II grievance, there is a declaration stating that Plaintiff "did not file a Level II Grievance."[14] (ECF No. 97-1, at 227.) But, as mentioned in the section of undisputed facts above, the issue of whether Plaintiff filed a level II grievance here is debatable. After all, the summary-judgment response's attachment of Defendant Bailey's response displays no added writing by Plaintiff, (ECF No. 153-15), while the *Martinez* report attachment of Defendant Bailey's response displays added writing by Plaintiff, (ECF No. 97-1, at 232). It is uncertain if that added writing was intended as a level II grievance or was the balance of Plaintiff's writing of the level I grievance, or was possibly entered on a different day but not included in the grievance process. However, any such dispute is immaterial because Plaintiff's possible grievance arguments (regarding safety concerns) at the potential level II remain so different from the due-process claim brought in his FAC.

The Court thus concludes that this issue is unexhausted. In sum, Plaintiff's level I grievance of May 25, 2017 did not serve to exhaust his cause of action attacking lack of due process in his disciplinary hearing. (ECF No. 97-1, at 231.) Instead, the grievance addressed the very different matter of SCJ officers' failure to protect inmates from safety concerns.

---

[14]Plaintiff

> disputes the allegation that he did not request a second-level review of his May 25, 2017, grievance regarding allegations upon which his Due Process Claim as it relates to the May 25, 2017, Disciplinary Hearing are premised. As discussed below, [Plaintiff] requested subsequent reviews of this issue on June 29, 2017, November 10, 2017, and August 8, 2019.

(ECF No. 153, at 6.)

But, as this Order explains throughout, each grievance process begins with a level I grievance that must be timely filed at the start. (ECF No. 97-1, at 33-35.) Within each grievance process is the two levels that Plaintiff was aware of before September 25, 2017, and three levels that he was aware of after that date. (ECF Nos. 75-20, at 6; 153-5, at 18.) The grievances at additional levels must be filed on a strict timeline. (ECF No. 97-1, at 35.) And, if grievance responders do not respond to late claims on the merits, the belated filing is not transformed into a proper filing. *See Ross*, 365 F.3d at 1186. As the discussion in this section of the Order concludes, none of Plaintiff's grievance processes regarding alleged due-process violations during April and May of 2017 were timely filed, then the grievance processes were invalidated by not being filed to level II or level III, and/or not being answered on the merits. Also, an inmate "request" is not the same as an inmate "grievance" and does not serve to exhaust the grievance process. (*See, e.g.*, ECF No. 153-37, 153-39.)

**2. Starting June 29, 2017**

On June 29, 2017, Plaintiff filed a level I grievance contesting his punishment for assaulting another inmate. (ECF No. 97-1, at 142.) Plaintiff specifically objected to his thirty-day "lock down," including the need for belly chains outdoors and loss of "rec yard" time and eligibility for “self-help groups,” and loss of “all privileges." (*Id.* at 142-43.) This grievance was denied on the merits, (*id.* at 144-45), and no level II grievance was filed, (*id.* at 9).

Looking at the timeline here, the Court concludes Plaintiff's grievances were untimely and his grievance process unfinished, resulting in failure to properly exhaust administrative remedies during the period at issue. The applicable disciplinary procedure took place on May 25, 2017, (*id.* at 143), meaning Plaintiff's level I grievance was due seven days later, or June 1, 2017, (ECF No. 153-5, at 18.). And, the grievance process known to Plaintiff at the time required two levels, though Plaintiff grieved only to level I. (*Id.*) But if inmates, like Plaintiff in this situation, do not file timely grievances or finish the grievance process, they are foreclosed from pursuing § 1983 actions. *Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

**3. Starting August 31 or September 19, 2017**

For this Order's purposes, the Court accepts Plaintiff's assertion that he filed a level I grievance on August 31, 2017, regarding which SCJ staff did not respond. (ECF Nos. 75-19, at 2-5; 153-18.) The level 1 grievance discussed legal-access concerns, not Plaintiff's due-process issues of April 1-18, 2017, and May 25, 2017. (ECF No. 75-19, at 2-5.)

On September 19, 2017, Plaintiff filled out a level II grievance, stating "You never responded from 8-31-17." (ECF Nos. 75-20, at 3-5; 153-18.) In the level II grievance, he brought up his eighteen days "in a cell in booking, . . . plus 10 days after that," and how he was

"handcuffed like an animal to go outside by [him]self with a guard." (ECF Nos. 75-20, at 3-5; 153-18.)

On September 25, 2017, Defendant Bown responded, "The grievance process has three levels," then discussed legal-access matters, before stating, "no further action is necessary." (ECF No. 75-20, at 6; Bown Decl., ECF No. 75-33, at 4; ECF No. 153-19.) On October 4, 2017, Defendant Bown apparently responded again "to [Plaintiff's] Level II grievance," saying he could "find nothing from [Plaintiff] dated 8/31/2017." (ECF Nos. 75-20, at 7; 153-20.) Bown then stated, "Your housing has been explained to you on several occasions and is only based on your classification. . . . Classification decisions of an inmate has no punitive intent and are simply intended to further the safety, security, order and control interests of the jail's operations." (ECF Nos. 75-20, at 7; 153-20.)

The Court recognizes that the latest of all the due-process issues raised as to Plaintiff's twenty-eight days in a booking cell and "handcuffed like an animal" occurred around May 25, 2017, with Plaintiff's punishment there lasting until somewhere around June 24, 2017. (ECF Nos. 75, at 14; 75-3, at 3; 75-34, at 13.) Thus, under the very most liberal reading of the calendar possible (used only for this Order's purposes), the latest any of these issues could have been raised in a grievance would have been July 1, 2017. (ECF No. 153-5, at 18.) With Plaintiff's level I grievance assumed to have been filed on August 31, 2017, Plaintiff was nearly two months late in grieving these issues, rendering them unexhausted and invalid for § 1983 consideration. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Further, Defendant Bown's response to the level II grievance stated, "The grievance process has three levels," presumably bringing this fact to Plaintiff's attention possibly for the

first time. (ECF Nos. 75-33, at 4; 153-19.) Still, even with Plaintiff's new knowledge of this level III requirement, there is no evidence that Plaintiff filed a level III grievance here. This failure to finish the grievance process is a second reason to deem this grievance process unexhausted and ineligible for a § 1983 action. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Finally, Bown's responses did not waive the fact that Plaintiff's grievances were filed out of time and that the level I grievance addressed only legal-access issues that are irrelevant to Plaintiff's due-process claims here, originating on April 1 to 18, and May 25, 2017. Plaintiff's attempts to raise his untimely potential due-process issues were unjustified as a response to the grievance-appeal question, "Why is the Informal Response unacceptable? (Be Specific)." (ECF No. 75-20, at 3.)

The result of this particular grievance process was a failure to exhaust required administrative remedies.

**4. Starting March 10, 2018**

On March 10, 2018, Plaintiff filed a level I grievance with no reference to the due-process issues from April 1 to May 25, 2017; instead, the grievance was to request church attendance. (ECF No. 75-36, at 191-93.) On March 15, 2018, Defendant Bailey responded, "No Action Taken," and stating, "Again . . . [y]ou will not be allowed to go to church services with other inmates for SAFETY REASONS." (ECF Nos. 75-23, at 5; 153-28.) On March 16, 2018, Plaintiff filed "Grievance Appeal," reiterating his arguments about attending church, then adding assertions of being kept "on administrative segregation" and with inmates with whom he had "conflicts," and again raises the issue of being "held . . . in booking for 18 days plus 10 more

days in lock down without due process." (ECF Nos. 75-23, at 6-9; 153-29.) On March 19, 2018, Defendant Bown responded to Plaintiff,

> as to your Level II grievance I assume, received by me on 03/19/2018, I am unsure as to how to answer. You send me three and one half pages of complaints and what appears to be case law that you think may justify your cause. You tie my hands as how to answer, by giving me a blank grievance form, claiming that you are appealing the answer you received. I have not seen your answer. Again I have no way to respond and give you a proper answer.

(ECF No. 153-30.) Also on March 19, 2018, Plaintiff replied that he continues to "request . . . church service," regardless of the alleged "security" concerns posed by SCJ employees. (ECF No. 153-31.) On March 21, 2018, in finding that Plaintiff was "given a proper answer" to his past challenges, Defendant Bown (in answer to Plaintiff's "Level II grievance") explained SCJ's policy vis-à-vis the practice of Plaintiff's recently stated religion of ASATRU. (ECF No. 153-32.)

So, as Plaintiff was allegedly held in booking from April 1 to 28, 2017, his level I grievance for that incident was due at the latest on May 5, 2017. (ECF No. 153-5, at 18.) This grievance is therefore vastly out of time. In this grievance process, the April 2017 issue was never addressed at all by SCJ personnel and so exhaustion and failure to raise the April 2017 issue in his level I grievance could not have been deemed waived. *See Ross*, 365 F.3d at 1186 ("If a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court."). Further, the grievance process was not pursued to level III, a level which Plaintiff was notified of by Defendant Bown's "Grievance Response" on September 25, 2017. (ECF No. 75-20, at 6.)

This grievance process failed to exhaust Plaintiff's required administrative remedies.

**5. Starting August 1, 2019**

On August 1, 2019, Plaintiff filed a level I grievance with no reference to the due-process issues from April 1 to May 25, 2017--more than two years before. (ECF No. 75-36, at 110-11.) On August 2, 2019, Sergeant Bailey responded, "No Action Taken." (*Id.* at 112.)

On August 3, 2019, Plaintiff filed a "Level II Grievance Appeal," in which he asserted the following in relevant part:

> You kept me in booking for 18 days then locked me down 10 days in a cell without ever providing 'due process.' . . . Then I was shackled in order to go to rec yard. . . . Again no due process provided. Two months you did this to me. . . . After completing my disciplinary lockdown, you kept me locked down 30 more days for no reason without due process.

(*Id.* at 112-13.)

On August 8, 2019, Defendant Bown responded,

> All of the issues that you bring up have been addressed by Sanpete County Jail staff, to you on several occasions, through the Grievance process . . . . You have been put on Administrative Segregation from the day you came to our jail, in the interest of safety and security of you, other inmates, staff, the citizens of Sanpete County and the Sanpete County Jail it's self [sic].

(*Id.* at 118.)

On August 9, 2019, Plaintiff apparently prepared what he labeled "Level III Grievance." (ECF No. 75-36.) Among many other issues, he alleged,

> "You decided," and "you put" me on administrative segregation the day I got here without providing due process. . . . You kept me in receiving 'nonhousing' area over 24 hrs. (18 days.) You classified me for general population but put me in administrative seg. You locked me down 10 more days. You put me in restraints

> 42 days for rec yard. . . . You conduct illegal disciplinary hearings, don't provide witnesses or footage.[15]

(*Id.* at 120, 122.) There is nothing in the record to indicate that Plaintiff submitted this level III grievance nor that it was received by SCJ staff.

This grievance process was started more than two years after the deadline passed. Also, in this process, the Plaintiff's due-process issues from April and May of 2017 were never addressed at all by SCJ personnel, so they did not waive the grievance process's untimeliness and Plaintiff's failure to raise the April and May 2017 issues in his level I grievance. *See Ross*, 365 F.3d at 1186 ("If a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court."). Further, the grievance process was apparently not pursued to level III, a level which Plaintiff was notified of by Defendant Bown's "Grievance Response" on September 25, 2017. (ECF No. 75-20, at 6.)

This grievance process failed to exhaust Plaintiff's required administrative remedies.

**6. Summary**

None of Plaintiff's three remaining due-process claims was properly grieved to every level of SCJ's process. Thus, Plaintiff failed to exhaust his administrative remedies here. These due-process claims are therefore dismissed.

---

[15]It appears that Plaintiff also refers to a disciplinary hearing he faced regarding an allegation that he assaulted someone on July 10, 2019. (ECF No. 75-36, at 125.) The July 10th assault and subsequent disciplinary proceedings are not a subject of this lawsuit.

**C. Retaliation Claim**

Plaintiff alleges that his federal free-speech rights were violated when, after his thirty-day lockdown sanction was scheduled for completion on June 22, 2017, Defendants Nielsen and G. Nunley gave him "30 more days modified lockdown without due process." (ECF No. 75, at 15.) Plaintiff seems to say that this was meant as "retaliation for [his] grievance of illegal write up." (ECF No. 75-17, at 1.) The additional days started around "June 22, 2017" and ended "July 21, 2017." (Pl.'s Decl., ECF No. 103-2, at 3.) On June 29, 2017, he "grieved" this additional lockdown, which he alleged was "punishment beyond [his original] 30 day sanction." (ECF Nos. 75, at 15; 75-17, at 1).

**1. Starting June 29, 2017**

Filed within seven days of June 22, 2017, the date upon which Plaintiff's additional days of (modified) lockdown started, " (ECF No. 103-2, at 3), Plaintiff's June 29, 2017 level I grievance--in which he says that, for his disciplinary issue he got "30 days lockdown loose all privileges," but "now [he's] double punished only coming out from 4pm to 10pm with no rec yard," (ECF No. 75-17, at 3)--was timely filed. Plaintiff went on to say,

> I served my 30 days lockdown, I'm just asking to be treated normal. No lockdown, outside rec, and library like before! Or is this some kind of retaliation for the grievances I have every right in the world to do! Yet the same sargent [sic] I grieved made up the schedule for modified lockdown. Feels like retaliation to me.

(*Id.* at 4.) On July 7, 2017, Defendant Nielson answered this grievance on the merits. (ECF No. 75-17, at 5-6.) Plaintiff did not file a level II grievance. (ECF Nos. 97-1, at 9; 104-3, at 6; 153-2, at 15.)

The grievance process known to Plaintiff at the time required two levels, though Plaintiff grieved only level I. (*Id.*) But if inmates, like Plaintiff in this situation, do not file timely grievances or finish the grievance process, they are foreclosed from pursuing § 1983 actions. *Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8. This grievance process therefore did not exhaust Plaintiff's required administrative remedies.

**2. Starting August 31 or September 19, 2017**

The Court again accepts Plaintiff's assertion that he filed a level I grievance on August 31, 2017, as to which SCJ staff did not respond. (ECF Nos. 75-19, at 2-5; 153-18.) The level 1 grievance discussed legal-access concerns, not Plaintiff's retaliation issue of "June 22, 2017" to "July 21, 2017." (ECF Nos. 75-19, at 2-5; 103-2, at 3.)

On September 19, 2017, Plaintiff filled out a level II grievance, stating "You never responded from 8-31-17," then, "See Attached." (ECF No. 75-20, at 3.) The attached paper was titled, "Inmate Grievance Appeal or 2nd Step." (*Id.* at 4.) Among many other allegations of mistreatment, Plaintiff stated, "Due to your negligence and ignorance to a safety concern you locked me down and, even after my punishment, you continued to keep punishing me." (*Id.* at 5.)

On September 25, 2017, Defendant Bown responded, "The grievance process has three levels," then discussed legal-access matters, before stating, "no further action is necessary." (ECF No. 75-20, at 6; Bown Decl., ECF No. 75-33, at 4; ECF No. 153-19.) On October 4, 2017, Defendant Bown apparently responded again "to [Plaintiff's] Level II grievance," saying he could "find nothing from [Plaintiff] dated 8/31/2017." (ECF Nos. 75-20, at 7; 153-20.) Bown then stated, "Your housing has been explained to you on several occasions and is only based on your classification. . . . Classification decisions of an inmate has no punitive intent and are

simply intended to further the safety, security, order and control interests of the jail's operations." (ECF Nos. 75-20, at 7; 153-20.)

The Court recognizes that a timely level I grievance on this issue was filed (see the next section above), but this grievance process--starting August 31, 2017--was not timely. (ECF No. 75-19.) Perhaps the latest the retaliation could be said to have occurred was "July 21, 2017," the day Plaintiff's modified lockdown ended. (ECF Nos. 75-19, at 2-5; 103-2, at 3.) Hence, a level I grievance would have needed to be filed within the seven days later, or July 28, 2017. With Plaintiff's level I grievance assumed to have been filed on August 31, 2017, Plaintiff was about one month late here in grieving this issue, as it continued to be unexhausted and invalid for § 1983 consideration. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Moreover, Defendant Bown's level II grievance response noted, "The grievance process has three levels," notifying Plaintiff of this crucial fact going forward. (ECF Nos. 75-33, at 4; 153-19.) But even with Plaintiff's knowledge of this level III requirement, there is no evidence that Plaintiff filed a level III grievance here. This failure to finish the grievance process is a second reason to deem this grievance process unexhausted and ineligible for a § 1983 action. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Finally, Bown's responses did not waive the fact that Plaintiff's grievances were filed too late and that the level I grievance raised only legal-access issues that are immaterial to Plaintiff's retaliation claim here. Plaintiff's efforts to advance his untimely potential retaliation issue was an inapt reply to the grievance-appeal question, "Why is the Informal Response unacceptable? (Be Specific)." (ECF No. 75-20, at 3.)

The result of this particular grievance process was a failure to exhaust required administrative remedies.

**3. Starting August 1, 2019**

On August 1, 2019, Plaintiff completed "Inmate Grievance Form," raising an I.D.H.O. Disciplinary hearing, in which he was "threatened" with a writeup "for filing too many appeals or paperwork," among other things--all unrelated to this case. (ECF No. 75-11, at 21.) On August 2, 2019, Sgt. Bailey responded, "No action taken." (*Id.* at 23.) On August 3, 2019, Plaintiff completed "Level II Grievance Appeal," in which he stated, among other things, "After completing my disciplinary lockdown, you kept me locked down 30 more days for no reason without due process." (*Id.* at 24.) On August 9, 2019, Plaintiff labeled a document "1st Level => Level III Grievance," stating in pertinent part, "You gave me excessive confinement of false imprisonment, modified lockdown." (*Id.* at 33.)

On August 8, 2019, Defendant Bown responded,

> All of the issues that you bring up have been addressed by Sanpete County Jail staff, to you on several occasions, through the Grievance process . . . . You have been put on Administrative Segregation from the day you came to our jail, in the interest of safety and security of you, other inmates, staff, the citizens of Sanpete County and the Sanpete County Jail it's self [sic].

(ECF No. 75-36, at 118.)

On August 9, 2019, Plaintiff apparently prepared what he labeled "Level III Grievance." (*Id.* at 119.) Among many other issues, he alleged, "You gave me excessive confinement species of false imprisonment, modified lockdown." (*Id.* at 122.) There is nothing in the record to indicate that Plaintiff submitted this level III grievance nor that it was received by SCJ staff.

Again, a timely level I grievance on this issue was filed, but this grievance process--starting August 1, 2019--was not timely. (ECF No. 75-36, at 110.) Perhaps the latest the retaliation could be said to have occurred was "July 21, 2017," the day Plaintiff's modified lockdown ended. (ECF Nos. 75-19, at 2-5; 103-2, at 3.) Hence, a level I grievance would need to have been filed within the seven days later, or July 28, 2017. With Plaintiff's level I grievance filed on August 1, 2019, Plaintiff was about two years late here in grieving this issue, as it continued to be unexhausted and invalid for § 1983 consideration. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Moreover, Defendant Bown's level II grievance response noted, "The grievance process has three levels," notifying Plaintiff of this crucial fact going forward. (ECF Nos. 75-33, at 4; 153-19.) Not only that, but the inmate handbook was updated on January 7, 2019, to reflect the fact that SCJ's grievance process had three levels. (ECF No. 153-6, at 18.) But even with Plaintiff's knowledge of this level III requirement, there is no evidence that Plaintiff filed a level III grievance here. This failure to finish the grievance process is a second reason to deem this grievance process unexhausted and ineligible for a § 1983 action. *See Plater*, 2024 U.S. App. LEXIS 19287, at *1, 8.

Finally, SCJ staff grievance responses did not waive the fact that Plaintiff's grievances were filed too late and that the level I grievance raised only legal-access issues that are immaterial to Plaintiff's retaliation claim here. (ECF No. 75-36, at 112, 118.) Plaintiff's attempts to later interject into the grievance process his tardy retaliation matter was an improper answer to the grievance-appeal question, "Why is the Informal Response unacceptable? (Be Specific)." (ECF No. 75-11, at 23-28.)

The result of this particular grievance process was a failure to exhaust required administrative remedies.

**4. Availability of Grievance Process**

Regarding only Plaintiff's retaliation claim, Plaintiff argues,

> To the extent the Court finds that Mr. Christensen was required to comply with the three-level grievance process described in the SCJ Manual, the Court should find that these administrative remedies were unavailable thus excusing the failure to exhaust because the Tenth Circuit Court has held that "a plaintiff with an objectively reasonable fear of retaliation from prison officials may show that administrative remedies were unavailable to him and thereby be excused from exhausting such remedies." *Tuckel v. Grover*, 660 F.3d 1249, 1251 (10th Cir. 2011). This is because administrative remedies are not "available in any meaningful sense if its use will result in serious retaliation and bodily harm." *See id.* at 1252 (internal citation and quotation omitted). In order to make a showing in this context to defeat a failure-to-exhaust defense, "an inmate must make two showings: (1) that the threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process; and (2) that the threat or intimidation would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the prison administrative process that the inmate failed to exhaust." *See id.* at 1254.
>
> In this case, Mr. Christensen has alleged in his Declaration that the threat of retaliation against him by prison officials deterred his filing of grievances since he was subject to a thirty-day lockdown as retaliation for filing grievances. (SOF, ¶ 38.) Second, while the Court must objectively consider whether the threat of being retaliated against would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance in this circumstance, the weight of the evidence to supports this finding because Mr. Christensen has alleged that he was indeed punished for filing grievances when he was locked down for thirty-days. (*Id.* at ¶¶ 37-38.)

(ECF No. 153, at 23-24.)

The *only* evidence that Plaintiff was deterred by retaliation from filing grievances is found in his declaration, in which he asserts, "Because of the threat of being retaliated against by prison officials, I was deterred from filing grievances on this issue." (ECF No. 153-4, at 4.) But

this is belied by Plaintiff's words in the grievance filed on June 29, 2017, within seven days of his alleged "double punish[ment]" of "modified lockdown":

> I served my 30 days lockdown, I'm just asking to be treated normal. No lockdown, outside rec, and library like before! Or is this some kind of retaliation for the grievances I have every right in the world to do! Yet the same sargent [sic] I grieved made up the schedule for modified lockdown. Feels like retaliation to me.

(ECF No. 75-17, at 3-4.) This fiery, accusatory language, filed almost immediately upon the alleged retaliatory behavior of Defendants Nielson and Nunley, is not the language of someone intimidated and deterred, but quite the opposite. Beyond this, Plaintiff went on to grieve the "retaliation" in two more grievance processes. (ECF Nos. 75-11, at 24; 75-20, at 3-5.)

Like the plaintiff in *Kee*, Plaintiff "has failed to satisfy this exception to exhaustion." *Kee v. Raemisch*, 793 F. App'x 726, 736 (10th Cir. 2019). Plaintiff has "not satisfied the subjective prong because he has not shown he was ever 'deter[red] . . . from lodging a grievance.' Indeed, the sheer number of his grievances belies such a claim." *Id.* (quoting *May*, 929 F.3d at 1235). And, like the plaintiff in *Escobar* who also generally complained about threats of retaliation for using the grievance process, Plaintiff's "conclusory allegations are belied by his own practice." *Escobar v. Mora*, 496 F. App'x 806, 809-10 (10th Cir. 2012) (unpublished). As in *Escobar* and here "the onus was on [Plaintiff] to show that the alleged impediments to exhaustion existed and did in fact prevent or deter him from using the . . . grievance procedure for the unexhausted claims," but Plaintiff "failed to do so," so this Court is "properly enforcing the exhaustion requirement." *Id.* (quoting *Tuckel*, 660 F.3d at 1254).

Finally, similar to the plaintiff's verified amended complaint in *Barnett v. Phillips*, No. 23-CV-232, 2025 U.S. Dist. LEXIS 58183, at *12 (N.D. Okla. Mar. 28, 2025), Plaintiff's

declaration's "'conclusory and self-serving' assertions of fear and retaliation are not sufficient to defeat summary judgment on the issue of exhaustion." *Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be 'merely colorable' or anything short of 'significantly probative.'" (citation omitted). As in *Barnett*, Plaintiff's "own statements and other evidence in the summary judgment record submitted by [himself] and Defendants show not only that administrative remedies were available to [Plaintiff], but also that he routinely submitted . . . grievances . . . before and after Defendants allegedly threatened, intimidated, and retaliated against him for filing . . . grievances or otherwise 'chilled his ability' or made him 'too scared' to utilize the grievance process." *Id.* at 12-13. On the record supplied, Plaintiff has not met his burden to show that administrative remedies were unavailable to him. *See Tuckel*, 660 F.3d at 1254.

**5. Summary**

Plaintiff's retaliation claim was not properly grieved to every level of SCJ's process.[16] And Plaintiff has not shown the grievance process was unavailable to him. Thus, Plaintiff failed to exhaust his administrative remedies here. The retaliation claim is therefore dismissed.

**D. Conclusion**

The undisputed material evidence shows that Plaintiff did not file proper and timely grievances to each required level of the SCJ grievance policy. The improper grievances were not waived by SCJ personnel's grievance answers. Regarding his retaliation claim, Plaintiff's has not

[16]Plaintiff's summary-judgment response argues, "Defendants[] considered [Plaintiff's] concerns on the merits and/or never took issue with the fact that the grievance or the request to review the grievance was untimely. (*Id.*; *see also* Responses, attached as Exhibits 16, 23, 43.)" (ECF No. 153, at 14.)

carried his burden of showing that SCJ's grievance process was "unavailable" to him. He was therefore not authorized to circumvent the identified benefits of exhaustion, which "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219 (citing *Woodford*, 548 U.S. at 88-91; *Porter*, 534 U.S. at 524-525).

## VI. CONVERSION CLAIM

Because Plaintiff's federal claims are now dismissed, he has but one pending claim remaining under the state-law tort of conversion.

The federal statute governing supplemental jurisdiction reads in pertinent part: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.S. § 1367(c) (2026).

In *Dexter*, when the defendants were determined to be immune from suit on the federal claims, the Tenth Circuit declined to consider the plaintiff's Utah constitutional claim, explaining,

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Dexter v. Ford Motor Co.*, 92 F. App'x 637, 644 (10th Cir. 2004) (unpublished) (citation modified).

For these same reasons, this Court declines to take supplemental jurisdiction over Plaintiff's state-law claim of conversion here. With all federal claims having been dismissed, this final claim is more properly evaluated by Utah state courts.

## VII. ORDER

**IT IS ORDERED** that:

**A.** Because Plaintiff did not exhaust administrative remedies as to his federal claims here, Defendants' Motion for Summary Judgment is **GRANTED**. (ECF No. 104.)

**B.** Plaintiff's remaining state-law claim is **DISMISSED**. Based on its discretion under 28 U.S.C.S. § 1367(c)(3) (2026), the Court declines to extend supplemental jurisdiction over the state-law claim.

**C.** This action is **DISMISSED** without prejudice.[17]

**D.** With no controversy surviving this Order, this action is **CLOSED**.

DATED this 28th day of September, 2026.

BY THE COURT:

Ted Stewart
United States District Judge

[17] Generally, courts should dismiss without prejudice claims that are unexhausted. *See Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007).